[No. 17942-7-III.  Division Three.  May 8, 2001.]

THE STATE OF WASHINGTON, *Respondent*, v. JEREMY MARK READ, *Appellant*.

*David B. Koch* (of *Nielsen Broman & Associates, P.L.L.C.*), for appellant.

*Gary A. Riesen, Prosecuting Attorney,* and *Douglas J. Shae, Deputy,* for respondent.

KATO, J. — The Supreme Court has remanded this case for reconsideration of this court's decision affirming Jeremy Mark Read's convictions for second degree murder and unlawful possession of a firearm. At issue here is that portion of the decision concluding that, while the trial court erred in permitting lay witnesses to give their opinions as to the validity of Mr. Read's self-defense claim, the errors did not require reversal. We reaffirm.

Mr. Read shot and killed Bruce Larson, Jr., in a Wenatchee motel room on May 3, 1998. *State v. Read,* 100 Wn. App. 776, 778, 998 P.2d 897, *review granted, case remanded,* 142 Wn.2d 1007 (2000). He was charged with second degree murder, first degree assault, and unlawful possession of a firearm. *Id.* At trial, Mr. Read testified he pulled the gun to protect himself, and it fired by accident. *Id.*

After a bench trial, the court rejected Mr. Read's defense of justifiable or excusable homicide and found he intended to kill Mr. Larson. *Id.* The court thus found Mr. Read guilty of second degree murder and first degree assault. *Id.* Based on evidence Mr. Read was a convicted felon at the time of the shooting, the court also found him guilty of unlawful possession of a firearm. *Id.*

On appeal, we rejected Mr. Read's contentions that evidentiary errors at trial required reversal. *Id.* at 778-89. However, we held the murder and assault convictions violated the double jeopardy clauses of the federal and state constitutions. *Id.* at 789-93. We thus vacated the assault conviction but affirmed the murder and firearm convictions. *Id.* at 793.

On Mr. Read's petition for review, the Supreme Court remanded the case for reconsideration in light of *State v. Palomo,* 113 Wn.2d 789, 798-99, 783 P.2d 575 (1989), *cert.*

*denied*, 498 U.S. 826 (1990).

Pertinent here is the following portion of our prior decision in this case:

> Second, we consider whether the trial court, sitting as factfinder in this bench trial, abused its discretion by permitting several lay witnesses to give their opinions as to the validity of Mr. Read's self-defense claim. This issue relates to the testimony of three eyewitnesses. Joshua Walsh testified:

Q   And what did Bruce do, do you recall?

A   He was sitting on the bed and when somebody said something, he got up and said, don't get smart. He didn't jump or nothing, just stood up and took a step toward [Mr. Read] and that was it.

Q   Was it a big step or —

A   No, it was just a normal step.

Q   Did he threaten him? Did he rush him?

A   Not to my knowledge. He didn't look like he was threatening him or anything.

Q   Was there any reason for Mr. Read at that point to defend himself?

A   No.

MR. ZANOL [defense counsel]: Objection.

MR. SHAE [prosecutor]: I think he can answer that question, Your Honor. That's one of the elements of this particular crime.

THE COURT: I'll overrule.

Q   Did Chad threaten him or anything like that?

A   Not to my knowledge, no.

Q   Did anybody threaten Mr. Read in that room that night?

A   No.

Q   Did Chad — did you see Bruce — did he have any weapons or anything in his hand?

A   No.

. . . .

Q   Was it surprising to you that someone would react this way?

A    Yeah. This is the first time I've ever seen anything happen like that.

Q    Was there any reason for Mr. Read to pull this weapon out?

A    No.

Q    Was there any reason for Mr. Read to, after he pulled it out, shoot it?

A    No.

Kim McIntosh testified:

Q    Did you see anything in [Bruce Larson's] hands?

A    No.

Q    Did he have any weapons?

A    No.

Q    Did he threaten anybody?

A    No.

Q    Did he run at anybody?

A    No.

Q    Did Mr. Read have to pull out a weapon at that time?

A    No.

Q    Could he have turned around and walked out of that room?

A    Yes.

Q    Did he have to shoot Mr. Larson?

A    No.

Q    Did anybody threaten Mr. Read?

A    No.

Q    Did anybody make him defend himself?

A    No.

Ms. McIntosh later testified:

Q    Was there anything else in [Mr. Larson's] hands?

A    No.

Q    And you said that he was — his hands were out like this; is that correct?

A    Mm-hmm.

Q   And if I said to you something like, I don't understand or why are we here today or I don't understand what you're saying, and I put my hands out like that, does that mean I'm challenging you?

A   No.

Q   And you just — for whatever reason you have decided that that's a challenging way?

A   Yeah.

Q   Could it also — could [Mr. Larson] have also just as likely sat back down on the bed?

A   Yeah.

Q   And could Mr. Read just as likely walked out of that room?

A   Yeah.

Q   And was there any reason why, with Mr. Larson standing there like this, that he needed to be shot?

A   No.

Q   Anything that Chad [Mr. Larson's brother] said in a rude manner, even if he was speaking rudely, that would cause Mr. Read to shoot his brother?

A   No.

Veronica Flom testified:

Q   Is there any reason that you could see why Mr. Larson should be shot that night?

A   No.

Q   Was there any reason that anybody needed to defend themself [sic] in that manner?

A   No.

Q   Was there any reason that anybody needed to defend themself [sic] in any manner?

A   No.

Opinion testimony by a lay witness must be "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." ER 701. As with expert witnesses, a lay witness may not give an opinion, either directly or by inference, as to a defendant's guilt. *State v. Black*, 109 Wn.2d 336, 348,

745 P.2d 12 (1987). Violation of this rule also violates the defendant's constitutional right to an impartial trial. [*State v. Carlin*, 40 Wn. App. 698, 701-02, 700 P.2d 323 (1985), *overruled on other grounds by City of Seattle v. Heatley*, 70 Wn. App. 573, 854 P.2d 658 (1993), *review denied*, 123 Wn.2d 1011 (1994).]

Mr. Read contends the quoted testimony of all three witnesses violated these rules. In fact, however, some of the questions and answers were fact-based and entirely proper. For example, the prosecutor did not solicit improper opinions by asking if anyone threatened Mr. Read, if Mr. Larson had anything in his hands, or if Mr. Larson made any movement toward Mr. Read. On the other hand, several other questions appear to have crossed the line. These questions went beyond mere perceptions of the witnesses and addressed the very heart of Mr. Read's self-defense claim. For example, the prosecutor sought improper opinion evidence by asking Mr. Walsh if there was "any reason for Mr. Read at that point to defend himself"; by asking Ms. McIntosh if Mr. Read "ha[d] to pull out a weapon at that time," if he "ha[d] to shoot Mr. Larson," if "anybody ma[d]e him defend himself," or if there was any reason why Mr. Larson "needed to be shot"; and by asking Ms. Flom if there was any reason why Mr. Larson was shot or for Mr. Read to defend himself. These questions solicited opinions that, at least by inference, went directly to the validity of Mr. Read's defense, and thus his guilt.

It is true, as the State points out, that the State bears the burden of proving the absence of self-defense beyond a reasonable doubt. *See State v. McCullum*, 98 Wn.2d 484, 491-96, 656 P.2d 1064 (1983). But this burden does not justify the State's resort to improper opinion evidence. The prosecutor's other questions in this case suggest some proper ways it could elicit factual evidence in satisfaction of its burden of proof. The lay witnesses' opinions in this case were improper.

A separate question, however, is whether the convictions should be reversed because of the improper opinions.

The action was tried to the court sitting without a jury. In such instances a liberal practice in the admission of evidence is followed in this state, supported, as it is, with a presumption on appeal that the trial judge, knowing the applicable rules of evidence, will not consider matters which are inadmissible when making his findings. *State v. Bell*, [59 Wn.2d

338, 352, 368 P.2d 177, *cert. denied*, 371 U.S. 818 (1962)]. And, in nonjury proceedings a new trial ordinarily will not be granted for error in the admission of evidence, if there remains substantial admissible evidence to otherwise support the trial court's findings. *State v. Ryan*, 48 Wn.2d 304, 293 P.2d 399 (1956).

*State v. Miles*, 77 Wn.2d 593, 601, 464 P.2d 723 (1970).

Under this rule, the court, sitting as the trier of fact, is presumed not to have considered the inadmissible lay opinions. But Mr. Read contends the presumption is rebutted in two ways.

First, he contends the court demonstrated its intent to consider the improper opinions by overruling defense counsel's objection. But the ruling, without explanation, did not demonstrate any intent to rely improperly on the opinions. Rather, it was an instance of the liberal practice in the admission of evidence in bench trials. The court's decision to *hear* the evidence does not suggest it considered it improperly.

Second, Mr. Read contends the written findings demonstrate that the court relied on the improper opinions.[3] The court "found" that one witness testified Mr. Read "did not have to defend himself." And the court "found" that Ms. McIntosh "indicated that she thought there might be a fight but that Mr. Read did not have to shoot or kill Mr. Larson." These "findings" do not show the court was influenced by the witnesses' opinions. Among the factual questions related to a self-defense claim is whether the defendant reasonably believed he was in imminent danger of harm from the victim. *State v. LeFaber*, 128 Wn.2d 896, 899, 913 P.2d 369 (1996). The fact finder "should put itself in the shoes of the defendant to determine reasonableness from all the surrounding facts and circumstances as they appeared to the defendant." *Id*. at 900. The witnesses' subjective opinions about whether they believed there was an imminent danger of harm to Mr. Read bore directly on a question the court, as fact finder, was required to resolve. While the opinions may have been improper in a jury trial, the trial court here certainly was capable of limiting its consideration to this proper purpose.

Mr. Read has failed to rebut the presumption that the trial judge, sitting as fact finder, understands the court rules and

will not consider inadmissible evidence. Mr. Read thus was not prejudiced by the witnesses' improper opinions. Moreover, even without the objectionable evidence, there is substantial other evidence supporting the trial court's findings. *See Miles*, 77 Wn.2d at 601. The error thus was harmless.

---

[3] The court's findings are essentially summaries of the witnesses' testimony. Strangely, some of these findings relate to witnesses whose testimony Mr. Read's brief does not quote or otherwise address in any way. At any rate, in many instances, the court's findings merely reflect the witnesses' own perceptions of the events and are not their opinions. For example, the findings state that one witness testified "she didn't feel threatened by anything that was happening and no one was making any threats." Another witness "indicated that Mr. Read was never threatened." Another witness testified "that there were no threats made toward him." Still another witness testified Mr. Larson "did not rush Mr. Read, he had no weapons, and did not threaten him."

*Read,* 100 Wn. App. at 783-789 (footnote 2 omitted).

We first consider the issue raised by the Supreme Court, which is whether reversal is required in light of *Palomo*. In *Palomo*, the defendant was charged with attempted second degree rape. *Palomo*, 113 Wn.2d at 791. The prosecution's only witness at trial was the police officer who saw the incident and heard the victim say the defendant had tried to rape her. *Id.* The trial court overruled an objection to the officer's hearsay testimony, and the defendant was convicted in a bench trial. *Id.* 791-92. On appeal, the issue was whether admission of the victim's hearsay statement as an excited utterance under ER 803(a)(2) violated the defendant's constitutional right of confrontation in the absence of a showing by the prosecution that the victim was unavailable to testify at trial. *Id.* at 793-97. The court held the testimony did not violate the defendant's right of confrontation. *Id.* at 797.

The *Palomo* court went on to observe that, even if the testimony had violated the defendant's right of confrontation, the error would have been harmless under the "overwhelming untainted evidence" test for constitutional error, which the court adopted in *State v. Guloy*, 104 Wn.2d 412, 426, 705 P.2d 1182 (1985), *cert. denied*, 475 U.S. 1020

(1986). *Palomo*, 113 Wn.2d at 798-99.

■ This is the portion of the *Palomo* decision to which the Supreme Court has called our attention here. On remand, Mr. Read contends the Supreme Court's reference to *Palomo* compels application of the "overwhelming untainted evidence" test in this case. But the *Palomo* discussion of the issue is dictum; if the principle were unassailably clear, surely the Supreme Court could have found more persuasive authority.[1] Moreover, the *Palomo* dictum does not even mention the possible application of the presumption that a trial judge, sitting as fact finder, will not consider evidence for an improper purpose. *See State v. Miles*, 77 Wn.2d 593, 601, 464 P.2d 723 (1970); *see also State v. Adams*, 91 Wn.2d 86, 93, 586 P.2d 1168 (1978); *State v. Bell*, 59 Wn.2d 338, 360, 363-64, 368 P.2d 177, *cert. denied*, 371 U.S. 818 (1962). That may be because in *Palomo* (assuming the evidence was improper) there was no other, proper basis for considering it.

■■ Here, as our prior decision pointed out, the witnesses' testimony about whether they believed there was an imminent danger of harm to Mr. Read bore directly on the question of self-defense, a factual matter the court was required to resolve. *Read*, 100 Wn. App. at 788. Thus, while in a jury trial the lay opinions would have been improper as infringements on Mr. Read's right to an impartial trial, *see State v. Carlin*, 40 Wn. App. 698, 701-02, 700 P.2d 323 (1985), *overruled on other grounds by City of Seattle v. Heatley*, 70 Wn. App. 573, 854 P.2d 658 (1993), *review denied*, 123 Wn.2d 1011 (1994), in the bench trial they may not require reversal unless the defendant can rebut the *Miles* presumption that a trial judge will not consider evidence for an improper purpose.

We conclude on this ground that *Palomo* does not compel the more rigorous harmless-error test. As our prior decision

---

[1] At least two other published decisions have applied the *Miles* presumption in the context of constitutional error. *See State v. Melton*, 63 Wn. App. 63, 68, 817 P.2d 413 (1991), *review denied*, 118 Wn.2d 1016 (1992); *State v. Hadd*, 127 Ariz. 270, 275, 619 P.2d 1047 (Ct. App. 1980).

pointed out, Mr. Read has failed to rebut the *Miles* presumption, and the conviction is reaffirmed on that basis.

■ Moreover, even if *Palomo* requires application of the "overwhelming untainted evidence" test, we would conclude the error was harmless. "Under that test, the court 'looks only at the untainted evidence to determine if the untainted evidence is so overwhelming that it necessarily leads to a finding of guilt.' " *Palomo*, 113 Wn.2d at 799 (quoting *Guloy*, 104 Wn.2d at 426).

The uncontradicted fact is that Mr. Read shot and killed Mr. Larson. The central factual questions at trial were: Was the homicide justifiable or excusable on grounds of self-defense or accident?[2]

■ "Homicide is excusable when committed by accident or misfortune in doing any lawful act by lawful means, without criminal negligence, or without any unlawful intent." RCW 9A.16.030. Although Mr. Read testified he did not intend to fire the gun, several other witnesses testified he pulled the gun from his pants pocket and aimed it at Mr. Larson for a brief period before firing. This testimony alone overwhelmingly rebuts Mr. Read's vague testimony that the gun fired by accident.

■ ■ Homicide may be justifiable if the slayer acts in defense of himself. RCW 9A.16.050. Among the factual questions related to a self-defense claim is whether the defendant reasonably believed he was in imminent danger of harm from the victim. *State v. LeFaber*, 128 Wn.2d 896, 899, 913 P.2d 369 (1996). "Deadly force may be used only in self-defense if the defendant reasonably believes he or she is threatened with death or 'great personal injury.' " *State v. Walden*, 131 Wn.2d 469, 474, 932 P.2d 1237 (1997) (quoting RCW 9A.16.050(1)). The fact finder "should put [himself] in the shoes of the defendant to determine the reasonableness from all the surrounding facts and circumstances as they appeared to the defendant." *LeFaber*, 128 Wn.2d at 900.

---

[2] The overwhelming evidence obviously supports the firearm conviction, as Mr. Read appears to concede. *See* Suppl. Br. of Appellant, at 6 (requesting new trial only on murder charge).

Although Mr. Read testified he felt threatened by Mr. Larson, the overwhelming evidence was that Mr. Larson made no threatening gestures or movements. Moreover, it is undisputed that Mr. Larson was unarmed. There is no evidence suggesting Mr. Read *reasonably* responded to what, at best, would have been a fistfight. *See State v. Walker*, 136 Wn.2d 767, 777, 966 P.2d 883 (1998). The overwhelming evidence thus rebuts Mr. Read's claim of self-defense.

The errors here were harmless, even under the "overwhelming untainted evidence" standard suggested by *Palomo*.

Mr. Read's convictions are reaffirmed.

KURTZ, C.J., and SWEENEY, J., concur.

Review granted at 145 Wn.2d 1006 (2001).